Patrice L. Bishop (182256)
service@ssbla.com
**STULL, STULL & BRODY**
9430 W. Olympic Blvd., Suite 400
Beverly Hills, CA  90212
Tel:    310-209-2468
Fax:    310-209-2087

*Counsel for Plaintiff*

[Additional Counsel on Signature Page]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH TOMASSINI, on behalf of the Oracle 401(k) Savings and Investment Plan, himself, and a class consisting of similarly situated participants of the Plan, | Case No.: 16-3583 |
| | **CLASS ACTION COMPLAINT** |
| Plaintiff, | |
| v. | |
| ORACLE CORPORATION, ORACLE 401(K) COMMITTEE, PETER W. SHOTT, BRUCE R. CHIZEN, GEORGE H. CONRADES, NAOMI O. SELIGMAN, H. RAYMOND BINGHAM, and JOHN DOES 1-25, | |
| | **JURY TRIAL DEMANDED** |
| Defendants. | |

.

1.    Plaintiff Joseph Tomassini ("Plaintiff"), individually and as representative of the class described herein, and on behalf of the Oracle 401(k) Savings and Investment Plan (the "Plan"), brings this action against the below-named defendants (collectively "Defendants") pursuant to §§ 404, 405, 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1104, 1105, 1109 and 1132.[1]

## NATURE OF THE ACTION

2.    This case is about the failure of the Defendants, fiduciaries of the Plan, to protect the interests of the Plan's Participants in violation of the Defendants' legal obligations under ERISA.  Defendants breached the duties they owed to the Plan, to Plaintiff, and to the putative class members who are also Participants by, *inter alia*, retaining common stock of Oracle Corporation ("Oracle" or the "Company" and "Oracle Stock" or "Company Stock", respectively) as an investment option in the Plan called the Oracle Stock Fund (the "Fund") when a reasonable fiduciary using the "care, skill, prudence, and diligence … that a prudent man acting in a like capacity and familiar with such matters would use" would have done otherwise.  *See* ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

3.    Specifically, and as pled in greater detail below, the Defendants permitted the Plan to continue to offer Oracle Stock as an investment option to Participants even after the Defendants knew or should have known that Oracle Stock was artificially inflated during the Class Period (between September 16, 2015 and June 1, 2016, inclusive), making it an imprudent retirement investment for the Plan given its purpose of helping Participants save for retirement.  Defendants were empowered, as fiduciaries, to remove Oracle Stock from the Plan's investment options, or to take other measures to help Participants save for their retirement, yet they failed to do that, or to act in any way to protect the interests of the Plan or their Participants from artificial inflation in Oracle Stock's price, in violation of Defendants' legal obligations under ERISA.

---

[1] All allegations contained herein are based upon personal information as to Plaintiff and the investigation of Plaintiff's counsel.  In particular, Plaintiff through his counsel has reviewed, among other things, documents filed with the U.S. Department of Labor (the "DOL") and the United States Securities and Exchange Commission (the "SEC"); other lawsuits against Oracle Corporation ("Oracle"); public statements and media reports, and had discussions with participants and beneficiaries (the "Participants") of the Plan.

4.      In *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459 (2014), the Supreme Court confirmed that plan fiduciaries violate ERISA when they continue to offer an imprudent plan investment option.  In *Fifth Third,* the Court considered a class action case similar to this one in which plan participants challenged the plan fiduciaries' failure to remove company stock as a plan investment option.  The Supreme Court held that retirement plan fiduciaries are required by ERISA to independently determine whether company stock remains a prudent investment option.  In that case, the defendant-fiduciaries argued that their decision to buy or hold company stock was entitled to a fiduciary-friendly "presumption of prudence" standard.  *Fifth Third*, 134 S. Ct. at 2463.  The Supreme Court rejected that argument, holding that "no such presumption applies," and further held "that the duty of prudence ***trumps*** the instructions of a plan document, such as an instruction to invest exclusively in employer stock even if financial goals demand the contrary."  *Id.* at 2463, 2468 (citation omitted) (emphasis added).  Accordingly, the Plan's "fiduciaries are subject to the same duty of prudence that applies to ERISA fiduciaries in general."  Id. at 2463.  Thus, even if the Plan purportedly required Oracle Stock be offered as an investment option, the Plan's fiduciaries were obligated to disregard that directive if and when Company Stock was an imprudent investment option for the Plan.

5.      The thrust of Plaintiff's allegations under Counts I (breach of the duty of prudence) and II (breach of the duty of loyalty) is that Defendants allowed the investment of the Plan's assets in Oracle Stock throughout the Class Period despite the fact that Defendants knew or should have known that that investment was imprudent as a retirement vehicle for the Plan.

6.      Oracle Stock was artificially inflated during the Class Period while the Plan spent tens of millions of dollars purchasing Company Stock.  During the Class Period, Oracle used improper accounting practices to inflate the Company's cloud computing revenues by millions of dollars and terminated a Senior Finance Manager for raising the Company's improper accounting practices to the attention of her supervisors.

7.      Given the totality of circumstances prevailing during the Class Period, no prudent fiduciary could have made the same decision as Defendants here to retain and/or continue purchasing the clearly imprudent Oracle Stock as a Plan investment.  To remedy the breaches of

fiduciary duties as described herein, Plaintiff seeks to recover the financial losses suffered by the Plan as a result of the diminution in value of Company Stock invested in the Plan during the Class Period, and to restore to the Plan what Participants would have received if the Plan's assets had been invested prudently.

8.     As of the start of the Class Period on September 16, 2015, the Plan held over $1 billion in Company Stock, and it further acquired tens of millions of dollars of Oracle Stock while Oracle Stock was artificially inflated.  Had that money not been wasted on artificially inflated Oracle Stock, the Plan would have been significantly better off.

## JURISDICTION AND VENUE

9.     ***Subject Matter Jurisdiction.***  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

10.     ***Personal Jurisdiction.***  This Court has personal jurisdiction over all Defendants because they are all residents of the United States and ERISA provides for nation-wide service of process pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

11.     ***Venue.***  Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) because the Plan is administered in this District, some or all of the fiduciary breaches for which relief is sought occurred in this District, and one or more Defendants reside or may be found in this District.

## THE PARTIES

### Plaintiff

12.     Plaintiff Joseph Tomassini is a former Oracle employee and Participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).  Plaintiff suffered losses in his individual Plan account as a result of investing in Oracle Stock during the Class Period.

### Defendants

#### Company Defendant

13.     Defendant Oracle is s a provider of enterprise software and computer hardware products, and services. The Company's offerings include Oracle database and middleware software, application software, cloud infrastructure, hardware systems including computer server,

storage and networking products, and related services.   Oracle is a Delaware corporation headquartered at 500 Oracle Parkway, Redwood City, California 94065.

14.     At all times relevant to this Complaint, the Company managed and administered the Plan and the assets of the Plan and acted as a fiduciary with respect to the Plan, and/or appointed a committee to do so.  At all relevant times, Oracle was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.  Oracle is also the Plan's administrator according to the Plan's governing document (the "Plan Document"), Section 11.6 of which states that "The Company shall be the Administrator of the Plan for purposes of Section 3(16) of ERISA and Section 414(g) of the [Internal Revenue] Code. As such, the Company is the named fiduciary with discretionary responsibility for the administration of the Plan."

15.     Oracle was also a fiduciary because it managed and administered the Plan and the assets of the Plan, directing Plan assets among investment options, as shown, *inter alia*, by the Thirtieth Amendment To Trust Agreement Between Fidelity Management Trust Company And Oracle Corporation, dated June 22, 2015, in which Oracle directed the Trustee to move Plan funds between investment options, directing the Plan's trustee:

> to liquidate all participant balances held in the Artisan Small Cap Value Fund Institutional Shares and Perkins Mid Cap Value Separate Account to the US Small-Mid Cap Value Stock Portfolio Fund (ii) effective at the close of business (4:00 p.m. ET) on June 22, 2015, to redirect all participant contributions directed to the Artisan Small Cap Value Fund Institutional Shares and Perkins Mid Cap Value Separate Account to be invested in the US Small-Mid Cap Value Stock Portfolio Fund, and (iii) to permit no further investments in the Artisan Small Cap Value Fund Institutional Shares and Perkins Mid Cap Value Separate Account as investment options for the Plan after the close of business (4:00 p.m. ET) on June 22, 2015.

///

///

///

- 4 –

**The Committee Defendants**

16.     Defendant Oracle 401(k) Committee (the "Committee") had a fiduciary duty to select all of the Plan's investment options, and to do so prudently.   Section 11.7 of the Plan Document states:

> (a) The Committee is the named fiduciary with the discretionary authority to: (1) interpret the Plan; (2) formulate such rules and regulations as are necessary to administer the Plan instrument in accordance with its terms; (3) conduct final review of claims under the claims review procedure; and (4) establish and carry out the funding policy of the Plan. The Committee shall be responsible for reviewing the funding policy and method of the Plan.
> (b) The Committee shall consist of three or more persons. The members of the Committee shall be appointed by, and hold office at the pleasure of, the Senior Vice President of Oracle America, Inc., and shall serve as such without compensation, although the Compensation Committee of the Board of Directors of the Company shall have the ultimate authority to appoint and remove members of the Committee.

17.     Defendant Peter W. Shott, Vice President of Human Resources of Oracle, signed the Plan's Form 11-K filed on May 13, 2016 (the "2016 11-K"), and its 11-K filed on May 14, 2015.  Defendant Shott also signed the Plan's 2014 Annual Return/Report of Employee Benefit Plan filed on Form 5500 with the Department of the Treasury on June 1, 2015 (the "2014 Form 5500") as "plan administrator."   Plaintiff thus believes Defendant Shott was a member of the Committee.

18.     John Does 1-25, without limitation, were members of the Committee, any other committee(s) or sub-committees of the Committee which administered the Plan, and the members of any such other such committee or sub-committee.   The identity of the committee(s) and the members of the committee(s) which was or were responsible for carrying out the provisions of the Plan, is currently not known.  John Does 1-25 are believed to be employees of the Company and fiduciaries of the Plan.  The 2016 11-K states, in relevant part, that "[c]ertain members of Oracle Corporation management perform administrative and fiduciary duties for the Plan that qualify them as parties-in-interest and/or related parties of the Plan."

19.     At all relevant times, the Committee and the John Doe defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it exercised

discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

20.   The Committee and its members are collectively referred to herein as the "Committee Defendants".

**The Monitoring Defendants**

21.   As noted above, Plan Section 11.7(b)

(b) The Committee shall consist of three or more persons. The members of the Committee shall be appointed by, and hold office at the pleasure of, the Senior Vice President of Oracle America, Inc., and shall serve as such without compensation, although the Compensation Committee of the Board of Directors of the Company shall have the ultimate authority to appoint and remove members of the Committee.

22.   By virtue of their "ultimate authority to appoint and remove members of the Committee", Defendants the Compensation Committee of the Board of Directors of Oracle (the "Compensation Committee"), and its members had the duty and responsibility to properly appoint, monitor and inform the Committee and John Doe defendants (as defined herein) and/or other persons who exercised day-to-day responsibility for the management and administration of the Plan and their assets.

23.   Defendant Bruce R. Chizen served as the Chair of the Compensation Committee from the start of the Class Period until November 18, 2015, and thereafter served as an alternate member of the Compensation Committee.

24.   Defendant George H. Conrades served as member of the Compensation Committee at all relevant times.

25.   Defendant Naomi O. Seligman served as member of the Compensation Committee at all relevant times, and as the Vice Chair of the Compensation Committee after November 18, 2015.

26.   Defendant H. Raymond Bingham served as the Chair of the Compensation Committee after November 18, 2015.

27.   The Defendants named in ¶¶ **Error! Reference source not found.**1 through 266 are collectively, and together with the Company, referred to herein as the "Monitoring

- 6 –

Defendants." The Monitoring Defendants were persons who had the duty and responsibility to properly appoint, monitor and inform the Committee and John Doe defendants (as defined herein) and/or other persons who exercised day-to-day responsibility for the management and administration of the Plan and their assets. The Monitoring Defendants failed to properly appoint, monitor and inform such persons in that the Monitoring Defendants failed to adequately inform such persons about the true financial and operating condition of the Company or, alternatively, the Monitoring Defendants did adequately inform such persons of the true financial and operating condition of the Company (including improper accounting practices to inflate the Company's cloud computing revenues by millions of dollars during the Class Period and terminated a Senior Finance Manager for raising the Company's improper accounting practices to the attention of her supervisors, as identified herein) but nonetheless continued to allow such persons to offer Oracle Stock as an investment option under the Plan when the market prices of Oracle Stock was artificially inflated and Oracle Stock was an imprudent investments for Participants' retirement accounts under the Plan. Liability is only asserted against each of the Monitoring Defendants for such periods of time as the Monitoring Defendants acted as a fiduciary with respect to the Plan.

**Additional "John Doe Defendants"**

28. To the extent that there are additional officers and employees of Oracle who were fiduciaries of the Plan during the Class Period, or any other committees or members of such committees that were fiduciaries of the Plan in connection with the allegations herein, the identities of whom are currently unknown to Plaintiff, Plaintiff reserves the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 1-25 include, in addition to the above, other individuals, including, but not limited to, Oracle officers and employees, who were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

**THE PLAN AND THE FUND**

29. The Plan's purpose is to help Participants save for retirement. The preamble to the Plan Document states that "Oracle Corporation established the Oracle Corporation 401(k) Savings and Investment Plan effective January 1, 1986 for the purpose of providing retirement benefits for

- 7 –

the Employees of Oracle Corporation."   The preamble further states that "The Plan is hereby amended and restated in its entirety effective January 1, 2014 (unless specified otherwise herein)."

30.     The 2016 11-K includes the following "Description of the Plan":

The following description of the Oracle Corporation 401(k) Savings and Investment Plan (Plan) provides only general information. Participants should refer to the Plan document for a more complete description of the Plan's provisions.

**General**

The Plan is a defined contribution plan originally established in 1986 that has since been amended and for which Oracle Corporation (Oracle) is the current sponsor. The Plan was established for the purpose of providing retirement benefits for the U.S. employees of Oracle and its subsidiaries. The Plan is intended to qualify as a profit sharing plan under Section 401(a) of the Internal Revenue Code of 1986, as amended (the Code), with a salary reduction feature qualified under Section 401(k) of the Code. The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974, as amended (ERISA). The Plan is administered by the 401(k) Committee, members of which are appointed by the Compensation Committee of Oracle's Board of Directors or the Executive Vice President, Human Resources. Fidelity Management Trust Company is the directed trustee of the Plan; Fidelity Investments Institutional Operations Company, Inc. (Fidelity) serves as the record keeper to maintain the individual accounts of each of the Plan's participants.

**Eligibility**

All employees regularly scheduled to work a minimum of 20 hours per week or 1,000 hours in a Plan year on the domestic payroll of Oracle and its subsidiaries that have adopted the Plan are eligible to participate in the Plan as of the first date, or any succeeding entry date following the date the employee is credited with one hour of service with Oracle. However, the following employees or classes of employees are not eligible to participate: (i) employees whose compensation and conditions of employment are subject to determination by collective bargaining; (ii) employees who are non-resident aliens and who received no earned income (within the meaning of the Code) from Oracle; (iii) workers who are performing services at an Oracle facility as an employee of a third-party entity that is not an employment agency; (iv) employees of employment agencies; and (v) persons who are not classified as employees for tax purposes.

**Contributions**

Each year, participants may contribute up to 40% of their eligible compensation as defined by the Plan document. Annual participant contribution amounts are limited to $18,000 of salary deferrals for the year ended December 31, 2015 ($24,000 for participants 50 years old and older), as determined by the Internal Revenue Service (IRS). Salary deferrals consist of pre-tax and/or Roth 401(k) contributions.

Oracle matches 50% of an active participant's salary deferrals up to a maximum deferral of 6% of compensation for the pay period, with maximum aggregate matching of $5,100 in any calendar year. Oracle has the right, under the Plan, to discontinue or modify its matching contributions at any time. Participants may also contribute amounts representing distributions from other qualified plans. All of Oracle's matching contributions are made in cash on a pre-tax basis.

*Investment Options*

Participants direct the investment of their contributions and Oracle's matching contributions into various investment options offered by the Plan. The Plan currently offers investments in Oracle's common stock, common/collective trust funds, mutual funds, separately managed account funds (including a stable value fund) and Brokerage Link. Brokerage Link balances consist of the mutual funds offered by the Plan, as well as mutual funds offered by other registered investment companies, common stock or other investment products.

*Participant Accounts*

Each participant's account is credited with the participant's and Oracle's contributions and allocations of Plan earnings. All amounts in participant accounts are participant directed.

*Vesting*

All elective contributions made by participants and earnings on those contributions are 100% vested at all times. Participants' vesting in Oracle's matching contributions is based on years of service. Participants are 25% vested after one year of service and vest an additional 25% on each successive service anniversary date, becoming 100% vested after four years of service.

Participants forfeit the nonvested portion of their accounts in the Plan upon termination of employment with Oracle. Forfeited balances of terminated participants' nonvested accounts may be used at Oracle's discretion, as outlined in the Plan, to reduce its matching contribution obligations. During the year ended December 31, 2015, Oracle used $4,900,000 of forfeited balances to reduce its matching contribution obligations. The amounts of unallocated forfeitures at December 31, 2015 and 2014 were $936,000 and $855,000, respectively.

31.     The 2016 11-K states that "The Oracle Stock Fund (Fund) is tracked on a unitized basis, which allows for daily trades. The Fund consists of Oracle common stock and investment in the Fidelity Institutional Money Market Fund sufficient to meet the Fund's daily cash needs. The value of a unit reflects the combined market value of Oracle common stock and the cash investments held by the Fund. At December 31, 2015, 2,573,027 units were outstanding with a value of $270.57 per unit. At December 31, 2014, 2,609,383 units were outstanding with a value of $328.16 per unit."

32.     The 2016 11-K further states that the Plan held $691.954 million in Oracle Stock at year end 2015, the Plan held $851.531 million in Oracle Stock at year end 2015, and the Plan's Oracle Stock depreciated by $215.592 million during 2015.  The 2016 11-K also states that "[d]uring the year ended December 31, 2015, the Plan made purchases of approximately $78,694,000 and sales of approximately $67,491,000 of Oracle common stock. In addition, the

- 9 –

Plan made in-kind transfers of Oracle common stock to participants, related to certain qualifying distribution, of approximately $11,108,000 during the year ended December 31, 2015."

33.   A document entitled "Required Disclosure Information; Oracle Corporation 401(k) Savings and Investment Plan; Participant Disclosure Notice; IMPORTANT PLAN AND INVESTMENT RELATED INFORMATION", produced on June 09, 2015, states that the benchmark for the Fund was the S&P 500 Software Index.

34.   Because of, *inter alia*, the cloud computing accounting revenue problems discussed herein, the Fund underperformed its benchmark during the Class Period:



## CLASS ACTION ALLEGATIONS

35.   Plaintiff brings this action derivatively on the Plan's behalf pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132, and as a class action pursuant to Rules 23(a), (b)(1), and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of the Plan, Plaintiff, and the following class of similarly situated persons (the "Class"):

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Oracle Corporation 401(k) Savings and Investment Plan at any time between September 16, 2015 and June 1, 2016, inclusive,[2] and whose Plan accounts included investments in Oracle Stock or the Oracle Stock Fund.

---

[2] Plaintiff reserves its right to modify the Class Period definition in the event that further investigation/discovery reveals a more appropriate and/or broader time period during which Oracle Stock constituted an imprudent investment option for the Plan.

CLASS ACTION COMPLAINT                                    Case No. 16-3583

36.     Given ERISA's distinctive representative capacity and remedial provisions, courts have observed that ERISA litigation of this nature present a paradigmatic example of a FED. R. CIV. P. 23(b)(1) class action.

37.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are at least tens of thousands of employees of Oracle who participated in, or were beneficiaries of, the Plan during the Class Period whose Plan accounts included Oracle Stock. For example, the 2014 Form 5500 represents that the Plan had 71,972 Participants as of December 31, 2014.   While some Participants may not have invested in the Fund, the Fund represents a substantial amount of the Plan's holdings and it is reasonable to assume that a significant portion of Participants invested in the Fund.

38.     At least one common question of law or fact exists as to Plaintiff and all members of the Class, which common question will resolve an issue that is central to the validity of each Class member's claims in one stroke.  Multiple such questions of law and fact common to the Class exist, including, but not limited to:

    a.  whether Defendants each owed a fiduciary duty to the Plan, Plaintiff, and members of the Class;

    b.  whether Defendants breached their fiduciary duties to the Plan, Plaintiff, and members of the Class by failing to act prudently and solely in the interests of the Plan and the Plan's participants and beneficiaries;

    c.  whether Defendants violated ERISA; and

    d.  whether the Plan, Plaintiff, and members of the Class have sustained damages and, if so, what is the proper measure of damages.

39.     Plaintiff's claims are typical of the claims of the members of the Class because the Plan, Plaintiff, and the other members of the Class each sustained damages arising out of Defendants' wrongful conduct in violation of ERISA as complained of herein.

- 11 –

40.     Plaintiff will fairly and adequately protect the interests of the Plan and members of the Class because he has no interests antagonistic to or in conflict with those of the Plan or the Class.   In addition, Plaintiff has retained counsel competent and experienced in class action litigation, complex litigation, and ERISA litigation.

41.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

42.     Class action status is also warranted under the other subsections of Rule 23(b)(1)(A) and (b)(2) because:   (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; and (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

**FACTS BEARING UPON DEFENDANTS' FIDUCIARY BREACHES**

43.     On September 16, 2015, the first day of the Class Period, Oracle issued a press release which was Exhibit 99.1 to a Form 8-K filed with the SEC on that date announcing its announced fiscal 2016 Q1 results (for the quarter ended August 31, 2015).   The release, entitled "CLOUD SAAS AND PAAS REVENUES UP 34% IN U.S. DOLLARS AND UP 38% IN CONSTANT CURRENCY; Cloud plus On-Premise Software Revenues Down 2% in U.S. Dollars and Up 6% in Constant Currency" highlighted the importance of cloud services, which were clearly a focus thereof.   The release stated, in part:

> . . . Total Cloud Revenues were $611 million, up 29% in U.S. dollars and up 34% in constant currency. Cloud software as a service (SaaS) and platform as a service (PaaS) revenues were $451 million, up 34% in U.S. dollars and up 38% in constant currency. Cloud infrastructure as a service (IaaS) revenues were $160 million, up 16% in U.S. dollars and up 23% in constant currency. Total On-Premise Software Revenues were $5.8 billion, down 4% in U.S. dollars but up 4% in constant currency. Total Hardware Revenues were $1.1 billion, down 3% in U.S. dollars but up 6% in constant currency. Total Services Revenues were $862 million, up 1% in U.S. dollars and up 10% in constant currency.

\* \* \*

"Our traditional on-premise software business plus our new cloud business grew at a combined rate of 6% in constant currency," said Oracle CEO, Safra Catz. "*This growth is being driven by new SaaS and PaaS annual recurring cloud subscription contracts which almost tripled in the quarter. As our cloud business scales-up, we plan to double our SaaS and PaaS cloud margins over the next two years – starting from 40% this just completed Q1, to approximately 60% this coming Q4, and then on up to 80% two years from now. Rapidly growing cloud revenue combined with a doubling of cloud margins will have a huge impact on EPS growth going forward.*"

"In Q1 SaaS and PaaS revenue was up 38% in constant currency – in Q4 that revenue growth rate will be over 60%," said Oracle CEO, Mark Hurd. "That cloud revenue growth rate is being driven by a year-over-year bookings growth rate of over 150% in Q1. *Our increasing revenue growth rate is in sharp contrast to our primary cloud competitor's revenue growth rates which are on their way down.*"

"We are still on target to book between $1.5 and $2.0 billion of new SaaS and PaaS business this fiscal year," said Oracle Executive Chairman and CTO Larry Ellison. "That means Oracle would sell between 50% more and double the amount of new cloud business than salesforce.com plans to sell in their current fiscal year. Oracle is the world's second largest SaaS and PaaS company, but we are rapidly closing in on number one."

(emphasis added).

44.     Oracle's September 18, 2015, Form 10-Q quarterly report reported cloud revenue of $611 million, and contained Sarbanes-Oxley Act certifications by Oracle's Co-Chief Executive Officer and Director (Mark V. Hurd) and Co-Chief Executive Officer and Director, Principal Executive and Financial Officer (Safra A. Catz).

45.     On September 30, 2015, Forbes published an article entitled "Is Oracle Cloud Revenue For Real?" which reported that:

Oracle is one of the most sophisticated and disciplined companies in the world when it comes to communicating its story to investors. They know what the market wants to hear and the company communicates about its operational results in a precise and assertive way. So, when it comes to understanding Oracle's performance, it pays to be skeptical.

One of the key components of Oracle's current value proposition is the idea that the company has not missed the boat when it comes to cloud adoption. Indeed, after the latest earnings reports some analysts concluded that Oracle's cloud revenue could be $2 billion in fiscal 2016, up from $1.5 billion in 2015. Now that $1.5 billion was only 4 percent of Oracle's $38 billion in revenue, but it also is 25 percent of Amazon's expected revenue of $6 billion in the coming year. Given Amazon's head start, one could conclude that Oracle is in the cloud race and may be catching up fast.

- 13 –

The question I want to ask is what does that $1.5 billion really represent? Is it evidence that Oracle has a thriving cloud ecosystem that is attracting customers? Or is it more evidence of discipline and assertiveness in directing client revenue toward cloud spending, through mechanisms such as "cloud credits" without really achieving adoption? According to Craig Gurante, CEO of Palisade Compliance and an expert on Oracle licensing, the answer is clearly yes. (See "Is Oracle Using Legal Pressure To Increase Cloud Sales?" for an explanation of how Oracle uses leverage to direct spending toward the cloud.)

An Oracle spokesperson declined to comment on this story.

If you think that Oracle is just using its leverage to force customers to make cloud purchases that are not being used, then that $1.5 billion is not an impressive indicator of cloud adoption, especially in the face of the massive incentives Oracle is providing its sales staff for selling cloud deals.

The stronger story for Oracle is that Oracle customers are moving substantial operations to the cloud, which has some significant long term financial benefits for Oracle, and that that operational footprint is growing. That's what's happening at Amazon Web Services.

But there is a big problem with the stronger story, where are the failures? Any major cloud that has had significant adoption has been beset by massive outages that have disrupted hundreds, thousands, sometimes millions of customers. It is no insult to Amazon Web Services to point out that they have had their share of such outages. So have Facebook and Google. These companies are breaking new ground and creating new types of engineering to support computing and scales never before achieved. Of course you are going to break some eggs.

So, if Oracle has $1.5 billion worth of cloud adoption, it should have a stream of outages to report. But aside from one or two we don't have evidence of such failures. Is that because Oracle is so brilliant at creating a cloud that they avoided the problems that have the other leaders have encountered? Or is it because the cloud really isn't being used that intensively?

This situation reminds me of a scene in science fiction author Isaac Asimov's Foundation series. At a council of psychohistorians, one contrarian points out what he considers a serious problem with the Seldon plan, the plan that predicts the course of development of a large federation of planets. The serious problem, the contrarian says, is there [] is too little error. The fit of the plan to reality was too good. It turns out that a class of benevolent robots had been directing human activity to proceed according to the plan.

My view is that the same thing is going on at Oracle. The story fits too well. If there were really $1.5 billion of cloud adoption going on at Oracle customers, we would have outages to point to. Instead, what is really going on is that Oracle's version of the benevolent robots, the sales team, is creating a number, cloud revenue, that fits Oracle's Seldon plan far too well to be credible.

- 14 –

46. On November 9, 2015, InfoWorld Daily News reported in an article entitled "Oracle insider: We're not walking the cloud talk" that:

> Last week, I wrote a post entitled "Yes, Oracle is finally serious about the cloud." Cloud was clearly the theme of Oracle OpenWorld, as a flurry of SaaS, PaaS, and IaaS announcements indicated. In my interview with Amit Chaudhry, vice president of public cloud, he stated that cloud computing was "very, very serious business" for Oracle and the company planned to fight "tooth and nail" against Amazon Web Services.

> I got pushback in response to last week's post from an unexpected quarter: inside Oracle itself. This individual, who asked to remain anonymous but has been with the company for nearly a decade, opened with a zinger: "We'll be serious about the cloud when Safra [Catz, co-CEO of Oracle] lets us hire some developers to work on it." I checked the identity of this source and can confirm this person is well placed and not in a low-ranking position.

> In my post last week, I mainly focused on Oracle's IaaS announcements, although I also mentioned existing PaaS and SaaS solutions. My source told me it may be a while before we see those IaaS offerings:

> Obviously we just announced Compute Cloud, but in reality I don't see a true Compute Cloud in place for six months. Our announcements are always a minimum of six months ahead of the technology. This has been true of every single cloud announcement. ... In similar fashion, Java PaaS was announced in 2012, but we did not even make it GA [generally available] until this summer. ... It seems that we announce a new product and then start development.

> Although these are strong statements, my source made clear the motivation in stepping forward was not to harm Oracle. On the contrary:

> The larger issue here is whether Oracle is acting in the best interest of its customers or even itself. My impression is that we let the analysts drive our strategy. Five years ago, it was all about engineered systems; now, it's all about cloud. The fact is that cloud is not a viable option for many mission-critical systems and will not be for quite some time. ... I find it painful to have to push a cloud solution that is not a viable option for many customers.

> My source also cited a Sept. 30 Forbes article written by Dan Woods entitled "Is Oracle cloud revenue for real?" In that story, Woods disputed analyst estimates that Oracle could claim $1.5 billion in cloud revenue in FY2015.

> Woods questioned what that $1.5 billion really represented. He asked whether Oracle sales might instead be "directing client revenue toward cloud spending, through mechanisms such as 'cloud credits' without really achieving adoption." He added that an expert on Oracle licensing, Palisade Compliance CEO Craig Guarente, had confirmed this.

- 15 –

My Oracle source wanted to "clear up a few things" in regard to that Forbes article:

What the account teams are doing is seeding cloud deals within larger deals. So if a customer does a $10 million deal, we are throwing in $500,000 in PaaS. The rep then gets his accelerator of 5X or 3X on that $500,000. I have seen this on 90 percent of our large deals. ... It is still booked as a sale and goes through the appropriate approvals with account reps getting credit. But in reality it is being given away. Somewhat amusingly, the customer's IT staff are not even aware of the inclusion. The problem, of course, is that Oracle does not recognize the revenue until the credits start being burned.

In defense of Oracle, my source went out of the way to say that the company was not (as Guarente has suggested) using license audits to strong-arm customers into cloud deals. My source also noted that Oracle was in some cases "truly starting to deliver self-service" for cloud customers.

Somewhat whimsically, my source wished Oracle would "cancel OpenWorld for one year, because it takes us a year or two to catch up with the marketing announcements." In addition, my source maintained that none of these statements would be a surprise to anyone inside Oracle, nor to "discerning" customers.

For everyone else, my source had a message: "If I'm a customer, I should be asking slightly more hard-hitting questions. [Like,] when do you expect it to be GA?"

Obviously, Oracle is not alone in hyping vaporware, particularly when it comes to the cloud. That someone inside a tech giant saw fit to go public with what appeared to be loyal dissent is highly unusual, but it underscores the cost of getting too far ahead of reality for both vendors who indulge in it and their customers.

47.     On December 16, 2015, Oracle issued a press release which was Exhibit 99.1 to a Form 8-K filed with the SEC on that date announcing its announced fiscal 2016 Q2 results (for the quarter ended November 30, 2015).  The release, entitled "ORACLE REPORTS GAAP EPS OF $0.51; NON-GAAP EPS OF $0.63; CLOUD SAAS AND PAAS REVENUES UP 34% IN U.S. DOLLARS AND UP 39% IN CONSTANT CURRENCY" highlighted the importance of cloud services, which were clearly a focus thereof.  The release stated, in part:

. . . Cloud plus On-Premise Software Revenues were $7.0 billion, down 4% in U.S. dollars and up 2% in constant currency. Total Cloud Revenues were $649 million, up 26% in U.S. dollars and up 31% in constant currency. Cloud software as a service (SaaS) and platform as a service (PaaS) revenues were $484 million, up 34% in U.S. dollars and up 39% in constant currency. Cloud infrastructure as a service (IaaS) revenues were $165 million, up 7% in U.S. dollars and up 11% in constant currency. Total On-Premise Software Revenues were $6.4 billion, down 7% in U.S. dollars and unchanged in constant currency. Total Hardware Revenues were $1.1 billion, down 16% in U.S. dollars and down 10% in constant currency.

Total Services Revenues were $861 million, down 8% in U.S. dollars and unchanged in constant currency.

* * *

"We're very pleased with our non-GAAP EPS of $0.63, beating the mid-point of guidance by 4 cents despite a stronger than expected currency headwind," said Oracle CEO, Safra Catz. "***We grew our SaaS and PaaS revenue 38% in constant dollars this past quarter, and we expect that revenue growth rate to accelerate to nearly 50% in Q3 and close to 60% in Q4. This rapid increase in our cloud revenue will help drive our SaaS and PaaS cloud gross margins from 43% in Q2 to approaching 60% in Q4 and drive significant EPS growth in Q4.***"

"It was a very strong growth quarter for our cloud business, with SaaS and PaaS bookings up 75% in constant currency and billings up 68% in U.S. dollars," said Oracle CEO, Mark Hurd. "We did 100 Fusion HCM deals and over 300 Fusion ERP deals in the quarter. We now have more than 1,500 ERP customers in the cloud – that's at least ten times more ERP customers than Workday."

"We are still on-target to sell and book more than $1.5 billion of new SaaS and PaaS business this fiscal year," said Oracle Executive Chairman and CTO Larry Ellison. "That is considerably more SaaS and PaaS new business than any other cloud services provider including salesforce.com."

(emphasis added).

48.     Oracle's December 18, 2015, Form 10-Q quarterly report reported cloud revenue of $649 million (compared with $516 million for the same three months of 2014), and contained Sarbanes-Oxley Act certifications by Oracle's Co-Chief Executive Officer and Director (Mark V. Hurd) and Co-Chief Executive Officer and Director, Principal Executive and Financial Officer (Safra A. Catz).

49.     On March 15, 2016, Oracle issued a press release which was Exhibit 99.1 to a Form 8-K filed with the SEC on that date announcing its announced fiscal 2016 Q3 results (for the quarter ended February 29, 2016).  The release, entitled "ORACLE REPORTS GAAP EPS OF $0.50; NON-GAAP EPS OF $0.64; Without the effect of U.S. Dollar strengthening both would have been 4 cents higher; CLOUD SAAS AND PAAS REVENUES UP 57% IN U.S. DOLLARS

///

///

- 17 –

AND UP 61% IN CONSTANT CURRENCY" highlighted the importance of cloud services, which were clearly a focus thereof.  The release stated, in part:

> . . . Cloud plus On-Premise Software Revenues were $7.1 billion, down 1% in U.S. dollars and up 3% in constant currency. Cloud software as a service (SaaS) and platform as a service (PaaS) revenues were $583 million, up 57% in U.S. dollars and up 61% in constant currency. Cloud infrastructure as a service (IaaS) revenues were $152 million, down 2% in U.S. dollars and up 2% in constant currency. Total Cloud Revenues were $735 million, up 40% in U.S. dollars and up 44% in constant currency. Total On-Premise Software Revenues were $6.3 billion, down 4% in U.S. dollars and unchanged in constant currency. Total Hardware Revenues were $1.1 billion, down 13% in U.S. dollars and down 8% in constant currency. Total Services Revenues were $793 million, down 7% in U.S. dollars and down 2% in constant currency.
>
> * * *
>
> "Our Cloud SaaS and PaaS revenue growth rate accelerated to 61% in constant currency in Q3," said Oracle CEO, Safra Catz. "This dramatic revenue increase drove our non-GAAP SaaS and PaaS gross margins up to 51% in Q3 as compared with 43% in Q2. Our cloud business is now in a hyper-growth phase. Our gross margins are climbing toward our target of 80%. These two factors will ignite substantial EPS and cash flow growth over Oracle's next few quarters."
>
> "Our SaaS and PaaS gross deferred revenue grew 96% in Q3 – twice as fast as Workday and three times faster than Salesforce.com reported in their most recent quarters," said Oracle CEO, Mark Hurd. "Q3 SaaS and PaaS bookings were up 77% in constant currency. We added 942 new SaaS customers in the quarter, including several customers that switched from Workday HCM to Oracle Fusion HCM. We had more than 250 customers go live on Fusion SaaS HCM and Fusion ERP in Q3 alone. We now have over 11,000 SaaS customers with nearly 2,000 Fusion ERP customers – ten times more ERP customers than Workday claims to have."
>
> "In absolute dollar terms, Oracle is already selling more enterprise SaaS and PaaS new cloud revenue than any other company in the world – including Salesforce.com," said Larry Ellison, Oracle Chairman and CTO. "We are growing much faster than Salesforce.com. We also have many more SaaS products than Salesforce.com. In some of our most important SaaS markets, such as ERP, HCM, Supply Chain and Manufacturing, Salesforce.com does not participate at all. By successfully competing in all of these markets, Oracle has the ability to sustain its high growth over a long period of time. That should make it easy for us to pass Salesforce.com and become the largest SaaS and PaaS cloud company in the world."

(emphasis added).

- 18 –

CLASS ACTION COMPLAINT                                      Case No. 16-3583

50.     Oracle's March 18, 2016 Form 10-Q quarterly report reported cloud revenue of $735 million (compared with $527 million for the same three months of 2015), and contained Sarbanes-Oxley Act certifications by Oracle's Co-Chief Executive Officer and Director (Mark V. Hurd) and Co-Chief Executive Officer and Director, Principal Executive and Financial Officer (Safra A. Catz).

51.     The above-quoted SEC filings in ¶¶43-44 and 47-500 were false and/or misleading statements and/or failed to disclose: Oracle used improper accounting practices to materially inflate its cloud computing revenues; that the Company had improperly terminated a Senior Finance Manager for raising its improper accounting practices to the attention of her supervisors; and that Oracle's public statements were thus materially false and misleading at all relevant times.

52.     As a result of the false and/or misleading statements above, Oracle Stock traded at inflated prices. After disclosure, Oracle Stock suffered a precipitous decline in market value, thereby causing significant losses and damages to Plaintiff and other Class members.

## THE TRUTH EMERGES

53.     On June 1, 2016, *Svetlana Blackburn v. Oracle America, Inc.*, Case # 3:16-cv-02925 (N.D. Cal.) was filed alleging: (1) Violation of Whistleblower Protections under the Sarbanes-Oxley Act (18 U.S.C. § 1514A et seq.); (2) Violation of Whistleblower Protections under the Dodd-Frank Wall Street Reform and Consumer Protection Act (15 U.S.C. § 78u-6 et seq.); (3) Retaliation under California Labor Code § 1102.5, and; (4) Wrongful Termination in Violation of Public Policy.  Plaintiff Blackburn alleges she that she in an experience CPA who "worked as a Senior Finance Manager, North America SaaS/Cloud Revenue" but she was fired because she "refused to engage in and threatened to blow the whistle on accounting practices she reasonably believed to be unlawful. Upper management was trying (and trying to push her) to fit square data into round holes, in an effort to bolster ORACLE Cloud Services financial reports that would be paraded before company leadership as well as the investing public."

54.     Ms. Blackburn's complaint further alleges that:

11.     Plaintiff's superiors instructed her to add millions of dollars in accruals to financial reports, with no concrete or foreseeable billing to support the numbers, an

- 19 –

act that Plaintiff warned was improper and suspect accounting. She told her supervisor, "I will blow the whistle" if ordered to proceed further in this fashion.

12.     The data, she knew, would end up in SEC filings and be touted on earnings calls, used to paint a rosier picture than actually existed on the ground. Dollar amounts that might seem modest on their face would propagate through other data, influencing a host of statements on reports made to the investing public. Executives above her in the chain of command went ahead and added accruals on their own; once again, Plaintiff objected. She expressed serious misgivings about their plans for re-accruals as well. A supervisor instructed her to ignore the absent billings that she had pointed out, because his intention was to reaccrue. After confronting him about the dangers of a lack of billings, and the history of bad accruals that never resulted in billings, the supervisor told her that her statements were "irritating." In addition to supervisors, a fellow finance manager and the company's assistant controller were on notice of Plaintiff's concerns. As Plaintiff continued to resist and warn of the accounting improprieties, she became more of a roadblock than a team player who would blindly generate financial reports using improper bases in order to justify the bottom lines that her superiors demanded to see.

13.     Within weeks, on October 15, 2015, the company terminated Plaintiff's employment.

55.     At 8:54 pm on June 1, 2016, *Reuters* reported that

Oracle Corp (ORCL.N) was sued on Wednesday by a former senior finance manager who claimed she was terminated in retaliation for complaining about improper accounting practices in Oracle's cloud services business.

Shares of Oracle fell about 2.6 percent to $39.23 in after-hours trading.

56.     Oracle Stock, which had closed at $40.26 on June 1, 2016, opened on June 2, 2016, at $38.70 and, after trading as low as $38.08, closed at $38.66.

### WHAT DEFENDANTS SHOULD HAVE DONE DURING THE CLASS PERIOD

57.     As alleged above, at least one Committee was a Vice President of Human Resources, and other committee members were high-level Oracle employees.  The Blackburn firing and subsequent whistleblower threats would likely have come across the desk of the Vice President of Human Resources for Oracle.  It is reasonable to infer that a senior Human Resources would be made aware of firings of officials senior enough to have direct reporting lines to the CEO and other top executives.  Additionally, Ms. Blackburn alleges that "in addition to [her] supervisors, a fellow finance manager and the company's assistant controller were on notice of

1    Plaintiff's concerns."  It is also reasonable to infer that the John Doe Defendants either knew or

2    should have known of Ms. Blackburn's allegations of accounting improprieties in Oracle's touted

3    cloud computing segment.

4        58.    Instead of taking some action to protect the Plan's assets and the Participants'

5    retirement savings, Defendants allowed the Plan to continue to hold and invest in artificially

6    inflated Oracle Stock.

7        59.    Disclosure might not have prevented the Plan from taking a loss on Company Stock

8    it already held; but it would have prevented the Plan from acquiring (through Participants'

9    uninformed investment decisions and continued investment of matching contributions) additional

10   shares of artificially inflated Company Stock: the longer the concealment continued, the more of

11   the Plan's good money went into a bad investment; and full disclosure would have cut short the

12   period in which the Plan bought Company Stock at inflated prices.

13       60.    Rather than do nothing (as they did), Defendants could have taken numerous steps

14   to fulfill their fiduciary duties to the Plan under ERISA.  As set forth more fully below, none of

15   these steps (a) would have violated securities laws or any other laws, or (b) would not have been

16   more likely to harm the Plan's Oracle Stock holdings than to help it.

17       61.    Defendants could have (and should have) directed that all Company and Plan

18   Participant contributions to the Fund be held in cash or some other short-term investment rather

19   than be used to purchase Oracle Stock.  A refusal to purchase Company Stock is not a

20   "transaction" within the meaning of insider trading prohibitions and would not have required any

21   independent disclosures that could have had a materially adverse effect on the price of Oracle

22   Stock.  Additionally, the First Amendment to the Trust Agreement Between Fidelity Management

23   Trust Company and Oracle states that "Provided that the Sponsor Stock Fund is open for

24   purchases and sales of units, the following rules will govern exchanges:" (emphasis added) and

25   thus suggests that the Sponsor Stock Fund might not be "open for purchases and sales of units"

26   during certain times.

27       62.    Defendants also should have closed the Company Stock itself to further

28   contributions and directed that contributions be diverted from Company Stock into prudent

- 21 –

1   investment options based upon the Participants' instructions or, if there were no such instructions,

2   the Plan's default investment option.

3   63.   Neither of these actions would have implicated, let alone been in violation of,

4   federal securities laws or any other laws.   Nor would the Plan ceasing to purchase additional

5   Company Stock likely send a negative signal to the market, especially given the large volume of

6   Oracle Stock traded on a daily basis.

7   64.   Alternatively, Defendants could have disclosed (or caused others to disclose)

8   Oracle's cloud accounting so that Oracle Stock would trade at a fair value.

9   65.   Given the relatively small number of shares of Oracle Stock purchased by the Plan

10   when compared to the market float of Oracle Stock, it is extremely unlikely that this decrease in

11   the number of shares that would have been purchased, considered alone, would have had an

12   appreciable impact on the price of Oracle Stock.

13   66.   Further, Defendants also could have:

14   a.   sought guidance from the DOL or SEC as to what they should have done;

15   b.   resigned as Plan fiduciaries to the extent they could not act loyally and prudently;

16   and/or

17   c.   retained outside experts to serve either as advisors or as independent fiduciaries

18   specifically for the Fund.

19   **DEFENDANTS ALLOWED ORACLE'S STOCK TO BE HYPED INSTEAD OF**

20   **PROTECTING THE PLAN**

21   67.   During the Class Period, Oracle and the other Defendants continued to issue

22   misstatements about the outlook for Oracle's cloud revenue, keeping Oracle Stock artificially

23   inflated while failing to take any of the above actions.   The truth would only be revealed months

24   later, as discussed above, that Oracle was manipulating accounting data to "paint a rosier picture

25   than actually existed on the ground."

26   **THE RELEVANT LAW: CLAIMS FOR RELIEF UNDER ERISA**

27   68.   ERISA requires that every plan name one or more fiduciaries who have "authority

28   to control and manage the operation and administration of the plan."   ERISA § 1102(a)(1).

- 22 –

Additionally, under ERISA, any person or entity, other than the named fiduciary that in fact performs fiduciary functions for the Plan is also considered a fiduciary of the Plan.  A person or entity is considered a plan fiduciary to the extent:

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

69.    At all relevant times, Defendants are/were fiduciaries, and acted as fiduciaries, within the meaning of ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

70.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

71.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that:

> any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

72.    ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), provide, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

- 23 –

73.     These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the highest known to the law and entail, among other things:

      a.  the duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan;

      b.  the duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor;

      c.  the duty to disclose and inform, which encompasses:  (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries

74.     Accordingly, if the fiduciaries of a plan know, or if an adequate investigation would reveal, that an investment option is no longer a prudent investment for that plan, then the fiduciaries must disregard any plan direction to maintain investments in such stock and protect the plan by investing the plan assets in other, suitable, prudent investments.

75.     ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

76.     Plaintiff therefore brings this action under the authority of ERISA § 502(a) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the

- 24 –

1    breaches of fiduciary duties by Defendants for violations under ERISA § 404(a)(1) and ERISA §

2    405(a).

3                                            **CAUSATION**

4           77.    The wasting of Participants' retirement savings in artificially inflated Oracle Stock

5    could have and would have been avoided, in whole or in part, by Defendants complying with their

6    ERISA-mandated fiduciary duties.

7           78.    Defendants – who knew or should have known that Oracle Stock was an imprudent

8    retirement investment – chose to, as fiduciaries, continue allowing the Plan to acquire further

9    Oracle Stock, while taking no action to protect their wards as Oracle's condition worsened and the

10   Participants' retirement savings were lost tens of millions of dollars.  Prudent fiduciaries would

11   have acted otherwise and taken appropriate actions to protect the Plan and the Participants.

12          79.    To the extent Defendants were required to take action based on non-publicly

13   disclosed information that they were privy to, at least the following alternative options – which are

14   pled as alternative statements under FED. R. CIV. P. 8(d)(2) to the extent they are inconsistent –

15   were available to Defendants and (a) could have been done without violating securities laws or

16   any other laws, (b) should have been done to fulfill Defendants' fiduciary obligations under

17   ERISA, and (c) would not have been more likely to harm the Plan than to help it.

18          80.    First, Defendants could have and should have directed that all Company and

19   Participant contributions to the Fund be held in cash rather than be used to purchase Oracle Stock.

20   The refusal to purchase Company Stock is not a "transaction" within the meaning of insider

21   trading prohibitions.  This action would not have required any independent disclosures that could

22   have had a materially adverse effect on the price of Oracle Stock.

23          81.    Second, Defendants should have closed the Fund itself to further contributions and

24   directed that contributions be diverted from Company Stock into other (prudent) investment

25   options based upon Participants' instructions or, if there were no such instructions, the Plan's

26   default investment option.

27          82.    Third, Defendants could have disclosed Oracle's problems, discussed above, so that

28   Oracle Stock ceased being artificially inflated.

- 25 –

CLASS ACTION COMPLAINT                                          Case No. 16-3583

83. Alternatively, Defendants could have:

    a. sought guidance from the DOL or SEC as to what they should have done;

    b. resigned as Plan fiduciaries to the extent they could not act loyally and prudently; and/or

    c. retained outside experts to serve either as advisors or as independent fiduciaries specifically for the Fund.

84. Instead, Defendants waited until the Plan had suffered tens of millions of dollars in losses during the Class Period because of artificial inflation in Oracle Stock to take any of the protective actions discussed above.

**REMEDIES FOR BREACHES OF FIDUCIARY DUTY**

85. As noted above, as a consequence of Defendants' breaches, the Plan suffered significant losses.

86. ERISA § 502(a), 29 U.S.C. § 1132(a) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan…." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate…."

87. As noted above, the Plan and its Participants have suffered tens of millions of dollars in damages as a result of Defendants' breaches of fiduciary duty. Plaintiff, the Plan, and the Class are therefore entitled to relief from Defendants in the form of: (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs; (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

    

88.     Each Defendant is jointly and severally liable for the acts of the other Defendants as a co-fiduciary.

## COUNT I

### FAILURE TO PRUDENTLY MANAGE THE PLAN'S ASSETS

### VIOLATION OF ERISA §§ 404(A)(1)(B) AND 405

### (BY THE COMPANY DEFENDANT AND COMMITTEE DEFENDANTS)

89.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

90.     This Count alleges fiduciary breaches against the Company Defendant and Committee Defendants (the "Prudence Defendants") for continuing to allow the investment of the Plan's assets in Oracle Stock throughout the Class Period despite the fact that they knew or should have known that such investment was imprudent as a retirement vehicle because Oracle Stock was artificially inflated during the Class Period.

91.     At all relevant times, as alleged above, the Prudence Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan and/or disposition of the Plan's assets.

92.     Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that all investment options made available to participants under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested.  The Prudence Defendants were responsible for ensuring that all investments in Company Stock in the Plan were prudent.  The Prudence Defendants are liable for losses incurred as a result of such investments being imprudent.

93.     Upon information and belief, Defendants failed to engage in a reasoned decision-making process regarding the prudence of Oracle Stock.  An adequate investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plan in Oracle Stock was clearly imprudent while Oracle Stock was artificially inflated.  A prudent fiduciary acting under

1    similar circumstances would have acted to protect Participants against unnecessary losses, and

2    would have made different investment decisions.

3          94.     The Prudence Defendants breached their duties to prudently manage the Plan's

4    assets. During the Class Period, the Prudence Defendants knew or should have known that, as

5    described herein, Company Stock was not a suitable and appropriate investment for the Plan. Yet,

6    during the Class Period, despite their knowledge of the imprudence of the investment, the

7    Prudence Defendants failed to take any meaningful steps to protect Plan's Participants.

8          95.     The Prudence Defendants also breached their duty of prudence by failing to provide

9    complete and accurate information regarding Oracle's true financial condition and, generally, by

10   conveying inaccurate information regarding the Company's cloud computing revenue. During the

11   Class Period, upon information and belief, Defendants fostered a positive attitude toward

12   Company Stock, and/or allowed Participants to follow their natural bias towards investment in the

13   equities of their employer by not disclosing negative material information concerning the

14   imprudence of investment in Company Stock. As such, Participants could not appreciate the true

15   risks presented by investments in Company Stock and therefore could not make informed

16   decisions regarding their investments in the Fund.

17          96.     As a result of Defendants' knowledge of and, at times, implication in, creating and

18   maintaining public misconceptions concerning Oracle's cloud computing revenue, any generalized

19   warnings of market and diversification risks that Defendants made to Participants regarding the

20   Plan's investment in the Fund did not effectively inform the Participants of the past, immediate,

21   and future dangers of investing in Company Stock.

22          97.     The Prudence Defendants also breached their co-fiduciary obligations by, among

23   their other failures, knowingly participating in each other's failure to protect the Plan from

24   inevitable losses. The Prudence Defendants had or should have had knowledge of such breaches

25   by other fiduciaries of the Plan, yet made no effort to remedy them.

26          98.     As a direct and proximate result of the breaches of fiduciary duties during the Class

27   Period alleged herein, the Plan and, indirectly, the Plan's Participants lost a significant portion of

28   their retirement investments. Had the Prudence Defendants taken appropriate steps to comply

with their fiduciary obligations during the Class Period, Participants could have liquidated some or all of their holdings in Company Stock, and refrained from spending tens of millions of dollars on artificially inflated Oracle Stock, and thereby eliminated, or at least reduced, losses to the Plan and themselves.

99.     Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

**COUNT II**

**BREACH OF DUTY OF LOYALTY**

**VIOLATION OF ERISA §§ 404(A)(1)(A) AND 405**

**(BY ALL DEFENDANTS)**

100.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

101.     This Count alleges fiduciary breaches against the Company, Monitoring Defendants and Committee Defendants (the "Loyalty Defendants") for continuing to allow the investment of the Plan's assets in Oracle Stock throughout the Class Period despite the fact that they knew or should have known that such investment was imprudent as a retirement vehicle because Oracle Stock was artificially inflated during the Class Period.

102.     At all relevant times, as alleged above, the Loyalty Defendants were fiduciaries of the Plan within meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

103.     ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on plan fiduciaries a duty of loyalty; that is, a duty to discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

104.     The duty of loyalty includes the duty to speak truthfully to the Plan and its participants when communicating with them.  A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to

- 29 –

materially mislead, plan participants and beneficiaries.  As the Supreme Court "succinctly explained" in *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996), "[l]ying is inconsistent with the duty of loyalty owed by all fiduciaries."

105.   During the Class Period, the Loyalty Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*:  failing to timely engage independent fiduciaries who could make independent judgments concerning the Plan's investments in Company Stock, and by otherwise placing their own and/or the Company's interests above the interests of the participants with respect to the Plan's investment in the Company's securities.

106.   During the Class Period, upon information and belief, certain Defendants, including the Monitoring Defendants, made direct and indirect communications with the Plan's participants in which they omitted or misrepresented information regarding or materially related to investments in Company Stock.  These communications included, but were not limited to, conference calls with analysts, SEC filings, annual reports, press releases, and Plan documents (including Summary Plan Descriptions).  Defendants, including the Monitoring Defendants, also acted as fiduciaries to the extent of this communication activity.

107.   Further, Defendants, as the Plan's fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Plan's participants, well-recognized in the 401(k) literature and the trade press concerning employees' natural bias toward investing in company stock, including that:

   a. Out of loyalty, employees tend to invest in company stock;

   b. Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

   c. Employees tend not to change their investment option allocations in the plan once made; and

   d. Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk.

108.    Knowing of these natural biases toward investment of Company Stock, Defendants should have been on high alert to protect the interests of the Plan participants.   Defendants, however, disregarded their duties of loyalty to the benefit of the Company as demonstrated by the Plan's massive holding and purchase of Company Stock with of Plan assets.

109.    Further, to the extent that Oracle satisfied its Plan matching obligations using artificially inflated employer securities which it already held, Defendants, who knew or should have known Oracle Stock was artificially inflated, participated knowingly and significantly in deceiving a Participants in order to save the employer money at the Participants' expense, which violates ERISA's duty of loyalty.

110.    The Loyalty Defendants also breached their co-fiduciary obligations by, among their other failures, knowingly participating in each other's failure to protect the Plan from inevitable losses.   The Loyalty Defendants had or should have had knowledge of such breaches by other fiduciaries of the Plan, yet made no effort to remedy them.

111.    As a consequence of the Loyalty Defendants' breaches of fiduciary duty during the Class Period by putting the interests of themselves and the Company ahead of the Plan and its participants, the Plan suffered tens of millions of dollars in losses, as its holdings of Company Stock were devastated.   If the Loyalty Defendants had discharged their fiduciary duties to loyally manage and invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided.   Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan and, indirectly, Plaintiff and the other Participants, lost a significant portion of their retirement investments.

112.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

///

///

///

- 31 –

## COUNT III

## FAILURE TO ADEQUATELY MONITOR OTHER FIDUCIARIES AND

## PROVIDE THEM WITH ACCURATE INFORMATION

## IN VIOLATION OF ERISA § 404

## (BY THE COMPANY AND MONITORING DEFENDANTS)

113.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

114.    This Count alleges fiduciary breaches against the Monitoring Defendants.

115.    At all relevant times, as alleged above, the Monitoring Defendants were fiduciaries of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

116.    As alleged above, the scope of the fiduciary responsibilities of the Monitoring Defendants included the responsibility to appoint, remove, and, thus, monitor the performance of other Plan fiduciaries, namely the Prudence Defendants.

117.    Under ERISA, a monitoring fiduciary must ensure that monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of a plan's assets, and must take prompt and effective action to protect the plan and participants when they are not.

118.    The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need).  In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to the plan's participants or for deciding whether to retain or remove them.

119.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know

- 32 –

that the monitored fiduciaries must have in order to prudently manage the plan and the plan's assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

120. During the Class Period, the Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

    a. failing, at least with respect to the Plan's investment in Company Stock, to properly monitor their appointee(s), to properly evaluate their performance, or to have any proper system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of the appointees' imprudent actions and inaction with respect to Company Stock;

    b. failing to ensure that the monitored fiduciaries appreciated the true extent of the Company's precarious financial situation and the likely impact that financial failure would have on the value of the Plan's investment in Company Stock;

    c. to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Plan's assets and, in particular, the Plan's investment in Company Stock; and

    d. failing to remove appointees whose performance was inadequate in that they continued to permit the Plan to make and maintain investments in the Company Stock despite the practices that rendered it an imprudent investment during the Class Period.

121. As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the Plan suffered tremendous losses.  If the Monitoring Defendants had discharged their fiduciary monitoring duties as described above, the losses suffered by the Plan would have been minimized or avoided.

122. The Monitoring Defendants are liable as co-fiduciaries because they knowingly participated in each other's fiduciary breaches as well as those by the monitored fiduciaries, they

- 33 –

1  enabled the breaches by those Defendants, and they failed to make any effort to remedy these

2  breaches despite having knowledge of them.

3      123.    Therefore, as a direct and proximate result of the breaches of fiduciary duty by the

4  Monitoring Defendants during the Class Period alleged herein, the Plan and, indirectly, the Plan's

5  Participants and beneficiaries, lost tens of millions of dollars of retirement savings.

6      124.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and

7  (a)(3), the Monitoring Defendants are liable to restore the losses to the Plan caused by their

8  breaches of fiduciary duties alleged in this Count and to provide other equitable relief as

9  appropriate.

### REQUEST FOR RELIEF

11      WHEREFORE, Plaintiff requests the following relief:

12      A.    A Judgment that the Defendants, and each of them, breached their ERISA fiduciary

13  duties to the Plan and the Participants during the Class Period;

14      B.    A Judgment compelling the Defendants to make good to the Plan all losses to the

15  Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan

16  resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the

17  Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the

18  Participants would have made if the Defendants had fulfilled their fiduciary obligations;

19      C.    A Judgment imposing a Constructive Trust on any amounts by which any

20  Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary

21  duty;

22      D.    A Judgment awarding actual damages in the amount of any losses the Plan

23  suffered, to be allocated among the Plan participants' individual accounts in proportion to the

24  accounts' losses;

25      E.    A Judgment requiring that Defendants allocate the Plan's recoveries to the accounts

26  of all Participants who had any portion of their account balances invested in Oracle Stock

27  maintained by the Plan in proportion to the accounts' losses attributable to the decline in the price

28  of Oracle Stock;

- 34 –

1    F.      A Judgment awarding costs pursuant to 29 U.S.C. § 1132(g);

2    G.      A Judgment awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the

3 common fund doctrine; and

4    H.      A Judgment awarding equitable restitution and other appropriate equitable

5 monetary relief against the Defendants.

6                                    **JURY DEMAND**

7        Plaintiff demands a trial by jury on all issues so triable.

8

9 Dated: June 24, 2016                    **STULL, STULL & BRODY**

10                               By: */s/ Patrice L. Bishop*
                                      Patrice L. Bishop (SBN 182256)
11                                    9430 West Olympic Blvd., Suite 400
                                      Beverly Hills, CA 90212
12                                    Telephone: (310) 209-2468
                                      Facsimile: (310) 209-2087
13                                    Email: service@ssbla.com

14                                    Michael J. Klein
                                      **STULL, STULL & BRODY**
15                                    6 East 45th Street
                                      New York, NY 10017
16                                    Telephone: (212) 687-7230
                                      Facsimile: (212) 490-2022
17                                    Email: mklein@ssbny.com

18                                    Peretz Bronstein
                                      **BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
19                                    60 East 42nd Street, Suite 4600
                                      New York, New York 10165
20                                    Telephone: (212) 697-6484
                                      Facsimile: (212) 697-7296
21
22                                    *Counsel for Plaintiff*

23

24

25

26

27

28

- 35 –